# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| ANTHONY A. CICCIA, | ) | Civil Action No.: 2:23-cv-3264-DCN-MGB |
|  | ) |  |
| Plaintiff, | ) | **COMPLAINT** |
|  | ) | **Violations of the ADA/ADAAA:** |
| vs. | ) | **Termination Based on Disabilities;** |
|  | ) | **Retaliation; Harassment;** |
|  | ) | **Failure to Engage in Dialogue and** |
| CUMMINS, INC., | ) | **Refusal to Accommodate** |
|  | ) |  |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| _____ | ) |  |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1. That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2. That, upon information and belief, the defendant Cummins, Inc. ("defendant") is a foreign corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

3. That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 12101, et seq. (Americans with Disabilities Act or "ADA"); the ADA Amendments Act of 2008 ("ADAAA"); 42 U.S.C. § 12203 (the retaliation provision of the ADA); and 28 U.S.C. § 1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business here; plaintiff resides here; and a substantial portion of the facts giving rise to plaintiff's claims occurred here.

**CONDITIONS PRECEDENT**

5.      That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.      That at all relevant times as defined by the ADA/ADAAA defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by that Act and is otherwise subject to it.

7.      That on or about November 23, 2021, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging harassment, discrimination, retaliation, and failure to accommodate/failure to enter into dialogue, all under the ADA/ADAAA.

8.      That on or about May 19, 2023 plaintiff received a Notice of Right to Sue from the EEOC regarding the complaint described in Paragraph 7 above.

9.      That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

**FACTUAL ALLEGATIONS**

10.      That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.      That in or around January of 2004 plaintiff was hired by the defendant as a Service Technician at its facility on Leeds Avenue in Charleston, South Carolina.  In or around 2007 defendant promoted plaintiff into a Senior Technician job and transferred him to defendant's Integration Center on Johns Island, South Carolina.  And, and in or around early November of 2013, defendant promoted (or placed) plaintiff into the position of Integration

Center Specialist Technician (the highest-level technician position at defendant), a job plaintiff held until his wrongful termination in January of 2021. Towards the end of his employment at defendant, plaintiff's job title became Specialized Technician Site Leader, but his job duties remained the same. Moreover, for the last seven (7) or eight (8) years of his employment, plaintiff was also assigned to perform the job of Site Safety Leader and was given the responsibility of leading the Work Requests meetings.

12. That as far as plaintiff's reporting structure at defendant over the course of his employment, he reported to the following four (4) managers: Ken Eckert ("Eckert") from 2008 to 2012; John ("Jack") Funkhouser ("Funkhouser") and Iain Pelto ("Pelto") between 2012-2018; and, starting in 2019, until the end of his employment with defendant, plaintiff reported to Scott Wildermuth ("Wildermuth"), the Application Engineers Manager who worked at the Charleston, South Carolina facility with plaintiff. Wildermuth, in turn, reported to Dave Moenssen, ("Moenssen"), the Department Head of the Marine Group, who worked out of Columbus, Indiana but who moved to the Charleston area shortly before plaintiff's termination. And Moenssen, in turn, reported to Dave Vatorro ("Vatorro").

13. That as the length of plaintiff's employment at defendant indicates, plaintiff performed his job duties at defendant in an above-satisfactory fashion and otherwise maintained an acceptable employment record there. To this point, plaintiff always received above-average overall ratings on his annual performance evaluations at defendant along with annual pay raises; plaintiff was promoted at least twice; his supervisors routinely praised his job performance; and he was given the extra responsibility of being a Site Safety Leader. Plaintiff did receive some isolated discipline of a non-serious nature over his sixteen (16) to seventeen (17) years of employment at defendant, but it was no more than any other employee received. For example, in sixteen (16) to seventeen (17) years of employment with defendant, plaintiff only received a

warning in or around 2014 for cussing, a verbal warning in 2019 for recording a conversation at work, and in 2020 plaintiff was placed on a performance improvement plan ("PIP"), which he duly passed and completed. While some of the discipline was legitimate, some of it, like the PIP in 2020, was discriminatory.

14.    That over the last twelve (12) years of plaintiff's employment at defendant, and as described below, plaintiff suffered two (2) back injuries that required him to seek and obtain accommodations from the defendant in order to perform the essential duties of his job. These back injuries substantially limited him in, among other things, the major life activities of walking, bending, stooping, standing, sleeping, lifting and pushing. Later in 2020, plaintiff broke his small toe at work, which exacerbated plaintiff's difficulties in performing the above-described major life activities.

15.    That specifically, in or around November of 2008 plaintiff injured his back at home and had to have lumbar surgery on his L-4 and L-5 discs. Plaintiff was out of work with permission for about two (2) to three (3) months and made a substantial recovery.

16.    That in or around February of 2010, plaintiff reinjured his lower back (discs L-4 and L-5 again), this time at work while lifting spare parts. This injury (or reinjury) was significant, requiring plaintiff to have a spinal fusion operation and requiring him to miss about four (4) months of work. Plaintiff filed a worker's compensation claim on this second injury and, thus, the defendant received documentation regarding plaintiff's precise injury, his treatment, and his restrictions. During the course of plaintiff's treatment for this second injury, Dr. Arthur Pacult, the physician who performed both of plaintiff's lower back surgeries, advised defendant on a Return to Work/Restriction Form dated September 20, 2010, that plaintiff had been diagnosed with Lumbar Stenosis and that he could return to work with the following restrictions:

❖ He could only drive for four (4) hours per day;

❖ He could only lift, push and pull up to twenty (20) pounds;

❖ He was to alternate standing and walking with sitting every thirty (30) minutes; and

❖ That *these restrictions were permanent*.

17.     That on or about January 11, 2011, plaintiff's physician advised defendant on a South Carolina Worker's Compensation Statement that:

❖ Plaintiff was diagnosed with Lumbar Stenosis;

❖ That plaintiff's injury was to his back, but also affected his hips, thighs, ankles and legs;

❖ That plaintiff had sustained an eighteen (18%) percent medical impairment to his back;

❖ That plaintiff could return to work, but with the following restrictions:  No lifting over fifty (50) pounds; that plaintiff must work in a neutral spine position; that he be allowed frequent position changes; and that his driving be limited to forty-five (45) minute stretches; and

❖ That future medical care would likely be needed on plaintiff's back.

18.     That other documents were generated in regard to this second injury and provided to defendant, putting defendant on notice that plaintiff had a lower back impairment and that he had *permanent restrictions* as a result of this injury.

19.   That in dealing with his back injuries, plaintiff made several requests for reasonable accommodations to the defendant.  And, plaintiff's first three (3) supervisors granted plaintiff's requests for accommodations without pause, by, for example, providing plaintiff with breaks, providing plaintiff with an ergonomic and/or special couch and chair so that plaintiff could take sitting breaks during the workday; they would assign other employees to assist plaintiff whenever plaintiff had to lift heavy objects or perform difficult tasks (job duties that were non-essential and duties plaintiff did not perform all the time); they would assign light-duty

tasks to plaintiff if such tasks were available; and they would allow plaintiff to bring his own tools to use at work.

20.   That with these accommodations, plaintiff was able to easily perform the essential duties of his job.

21.   That in or around early 2019, Wildermuth became plaintiff's direct supervisor.  From the time Wildermuth became plaintiff's supervisor until the time of plaintiff's termination, not only did Wildermuth deny most, if not all, of plaintiff's reasonable requests for accommodations, but he also took away the prior accommodations that plaintiff's first three (3) supervisors had granted to him.

22.  That in addition to denying plaintiff's requests for accommodations, Wildermuth would knowingly assign physically demanding tasks to plaintiff – tasks that exceeded or violated the medical restrictions placed upon plaintiff by his physicians. At the same time, Wildermuth would refuse to allow other employees to assist plaintiff in performing these physically demanding tasks, thereby denying plaintiff's requests for a reasonable accommodation.   To this point, when a fellow employee would try to assist plaintiff in performing a physically demanding task, Wildermuth would loudly tell the employee to stop helping plaintiff, even reprimanding the employee at times for trying to help plaintiff.

23.   That moreover, plaintiff discovered that Wildermuth was approaching plaintiff's coworkers and colleagues behind his back in an attempt to get them to provide negative information about plaintiff's job performance.  And, after listening to plaintiff make repeated requests for accommodations in meetings, Wildermuth began to exclude plaintiff from the meetings – even though plaintiff was a part of the Applications Team and even though plaintiff asked to attend the meetings.

24.    That Wildermuth also treated plaintiff with hostility and antagonism, while at the same time treating non-disabled employees more favorably.  Still, despite all of the above, plaintiff performed his job duties at defendant in an above-average fashion and in a manner that met defendant's legitimate expectations as evidenced by his 2018, 2019 and 2020 favorable evaluations by both his colleagues and supervisors alike.

25.    That in or around January or February of 2020 (within a year of his termination) plaintiff's colleagues and supervisors, including Wildermuth, again provided plaintiff with favorable overall scores on plaintiff's annual performance evaluation.  On or about February 17, 2020, Wildermuth provided plaintiff with a document entitled "Your 2020 Compensation" which stated that plaintiff had received an overall rating on his performance evaluation of "2" – a strong rating, given that defendant's evaluation scale goes from 1 to 5, with one (1) being the highest score and five (5) being the lowest score.  Thus, plaintiff received the second highest rating that an employee could receive at defendant that year.  That same document stated that plaintiff was receiving a 2.5% merit raise.

26.    That on or about March 11, 2020, and without warning, notice or cause, Wildermuth, Moenssen, Sara B. Wilson ("Wilson"), a Corporate Human Resource lead employee, and Linda Higgins ("Higgins"), a local Human Resources Generalist at defendant, all met with plaintiff and provided him with a detailed PIP which falsely alleged plaintiff was having a range of performance issues and which further gave plaintiff sixty (60) days to correct the alleged deficiencies.  While plaintiff disagreed with the PIP, he attempted to be conciliatory in his tone and demeanor in receiving it.  Still, at some point during the meeting, plaintiff defended himself by stating that giving him a PIP was not justified and, if there were issues with the way he performed his job, it was because he was disabled and not able to perform all of the duties of his job without reasonable accommodations and that Wildermuth was denying his

requests for said reasonable accommodations. Plaintiff's statements during this meeting constituted protected activity under the ADA/ADAAA.

27. That during the meeting Wilson remarked that, if that was indeed the case, then plaintiff would have to go back to the doctor and resubmit his medical information along with any request for accommodations. Exasperated (because the company had known about plaintiff's impairments and had accommodated him for at least the last ten (10) years at this point), plaintiff responded that he had filed a worker's compensation claim in regard to his 2010 on-the-job injury; that at the time he was advised that his disabilities and restrictions were permanent; that the company had all such medical documents in its files; that they were aware of his restrictions; and that nothing had changed with regard to plaintiff's disabilities since that time. Despite plaintiff's remarks, nothing changed for plaintiff at defendant in regard to his requests for accommodations. They were all still denied.

28. That shortly thereafter, following one of the Monday morning meetings at the Integration Center on Johns Island, plaintiff gave Wildermuth at least two (2) documents: one from the South Carolina Worker's Compensation Commission and one from his neurologist, both stating that plaintiff was permanently disabled and that his restrictions were, likewise, permanent. The documents were old, but they correctly reflected plaintiff's current medical condition.

29. That in all events, sometime after the 60-day duration of the PIP had expired, management advised plaintiff in clear and unequivocal terms and in a positive manner, that plaintiff had successfully completed the terms of the PIP and that it was no longer in effect.

30. That in or around mid to late June of 2020, Wildermuth gave plaintiff a mid-year performance evaluation, praising plaintiff's performance in several areas and expressly acknowledging that plaintiff had "successfully completed his PIP and the improvements were

noticed by all the teams he is a part of."  The evaluation was positive and it praised plaintiff for, among other things, expanding his job roles to include leading Work Request meetings, being the Site Safety Leader, helping others learn the product and marine industry, his ability to teach and train others, and his communication skills.

31.    That about a month after his mid-year review, on or about the morning of Thursday, July 23, 2020, while plaintiff was walking through the open bay door at the front of the Marine Integration Center building, he hit his small right toe on a concrete lip.  While not known at the time, plaintiff had actually broken the toe.  In all events, the injury caused plaintiff a great deal of pain.  He immediately advised a coworker, Roel Mariano ("Mariano"), and notified his supervisor, Wildermuth.  Later that morning, plaintiff sent an email to Wildermuth documenting the injury and the conversation they had earlier that day.  The email confirmed that plaintiff would stay off of his feet over the weekend and ice his toe.  Plaintiff also asked Wildermuth in the email whether they needed to fill out an accident report or give it more time.  The email ends with plaintiff stating that "the crushed stones out front need to be raked away from the boat and doors because [he and Mariano] had both rolled [their ankles] before walking [in that area]."

32.    That thereafter, plaintiff's toe continued to cause him intense pain.  Moreover, the toe was changing colors.  On or about August 3, 2020, having heard nothing from defendant about his injury or where to go to seek medical treatment, and still in significant pain, plaintiff went to  Doctors Care where his foot was x-rayed and he was diagnosed with a fractured right small toe.  Plaintiff was released by Doctors Care to return to work on "light duty" and directed that he could only have limited use of his right foot for one (1) week.

33.    That later that same day (August 3, 2020) Wildermuth emailed plaintiff advising plaintiff that he had spoken to "Peggy" (Margaret L. Goode ("Goode")), the head of

Health and Safety ("HHS") at defendant, and that she arranged for plaintiff to see one of the company doctors later that day.  Plaintiff responded he had already gone to a doctor that day as he was in a lot of pain and was unable to wait any longer to seek treatment.

34.    That nevertheless, plaintiff went to the company doctor, Concentra Medical Centers (SC), on August 3, 2020 as directed.  The physician there diagnosed plaintiff with an unspecified fracture of his right toe(s) and returned plaintiff to work with the following restrictions:  "Should be sitting 75% of the time; may not walk on uneven terrains; no climbing ladders; and patient is able to work the entire shift."  Otherwise, a follow-up appointment was scheduled for the following week.

35.    That  at his first opportunity, plaintiff filled out an Incident Report and took all the necessary steps to file a worker's compensation claim.

36.    That thereafter plaintiff went to work every day with excruciating pain in his right small toe, walking with a limp and seeing his toe change colors.  He also continued to go to the company's physician on a regular basis, as the pain in his toe was not getting any better.  To this point, a week later, on or about August 11, 2020, plaintiff went back to Concentra.  On this visit, the physician kept the previous restrictions in place and added a restriction which stated, "Walk and stand as needed, sit as needed."  Around this same general timeframe the doctor also had plaintiff wear a special open-toed shoe.  Plaintiff tried the shoe for about a week but it caused him to walk in a crooked fashion, which, in turn, exacerbated his lower back injuries to the point he could no longer wear the special shoe.  Instead, on a later visit to Concentra, plaintiff would be required to wear over-sized boots.

37.    That on or about August 18, 2020 plaintiff again visited Concentra.  This time the only change in his restrictions involved replacing the 75% sitting restriction with a

"weight bearing as tolerated" restriction.  Plaintiff again visited the company's doctor on or about September 1, 2020 with no changes in restrictions.

38.   That on or about September 15, 2020 plaintiff again visited the physician at Concentra as his toe was still not getting better.  He was still in excruciating pain, his toe was still discolored, and he was walking with a limp.  On this visit, the physician added a restriction which prohibited plaintiff from "going into the hull of the boat" as doing so would "hinder [his] healing."

39.   That on or about September 29, 2020 and again on October 1, 2020, plaintiff saw the company physician, as he continued to experience significant pain and he was still working under the same restrictions.  On October 13, 2020 plaintiff went back to the company doctor yet again.  This time the doctor ordered plaintiff to undergo an MRI on his right foot which was to take place October 20, 2020.

40.   That shortly after his last doctor's appointment, plaintiff began to have trouble getting Sedgewick, the third-party administrator for such claims, to approve the MRI so plaintiff was forced to miss his initial MRI appointment.  He also noticed that his worker's compensation claim was not proceeding as it should have been.  When he brought the issue up to Mindy Knight ("Knight"), the Occupational Health Nurse Manager at defendant, she responded on October 26, 2020 by sending him an email apologizing for the "delay in the MRI" for his worker's compensation injury, explaining there was an issue establishing the claim with the claims administrator, Sedgewick, as Sedgewick never received any of the clinical information relating to plaintiff's claim.  She ended the email by stating she was now working with the Sedgewick adjuster to get the claim set up immediately and that, once she got a claim number, she would contact Concentra to get all the documents and approve the MRI.

11

41.    That on that same day, October 26, 2020, Wildermuth's supervisor, Moenssen, sent a message to plaintiff telling him he owed plaintiff a beer for doing such a great job on the QSM Sea Water Sensor Test.

42.    That on or about October 28, 2020, a bit surprised and frustrated by the news that defendant had failed to send his medical information to Sedgewick, plaintiff sent an email to Knight asking for an explanation and further asking how it could take three (3) months for defendant to provide Sedgewick with the necessary paperwork to initiate his claim.    The following day, October 29, 2020, Knight sent an email to plaintiff explaining that a combination of issues contributed to the delay, including an injury she suffered that had her out of the office for a week, that plaintiff was apparently not in their accessibility data base, and that, when the paperwork was initially sent to Sedgewick, the adjuster there misunderstood the paperwork and failed to forward it to the appropriate person.

43.    That on or about November 17, 2020, plaintiff underwent an MRI and again visited the company physician in regard to his toe impairment.    This entire time plaintiff continued to go to work with his same restrictions and with an intense amount of pain in his toe, back, hip and leg.    Moreover, he had long-standing, preapproved vacation plans that took him out of work from around Thanksgiving of 2020 (November 24, 2020) until January 4, 2021. Such extended vacations were not unusual at Cummins for long-term employees like plaintiff.

44.    That as such, at the end of November 2020, plaintiff went out on vacation leave.    On or about December 1, 2020 (while still on vacation) plaintiff saw the physician at Concentra for the last time, as on that date the physician released plaintiff from care and to full work duties – even though plaintiff protested that he was still having issues with his toe.    In fact, plaintiff told his physician, his supervisors, and Human Resource employees that his toe was still not right and that he was still having issues with it.

45.     That on or about January 4, 2021, plaintiff reported back to work from his vacation, still experiencing issues with his toe.  Indeed, the toe impairment, in conjunction with plaintiff's long-standing lower back disabilities, worked together to cause plaintiff additional pain in his toe *and* in his lower back, all of which made it hard for plaintiff to move around freely, walk briskly, climb, stand, bend, push or squat.

46.     That upon his return to work, plaintiff continued to request the same reasonable accommodations set forth at length above.  In addition to those requests, in or around early January of 2021, plaintiff began to ask Wildermuth for reasonable accommodations in the form of using a hoist, gantry and a lifting table to lift heavy objects.  Plaintiff further advised Wildermuth that the new ergonomics policy implemented by the corporate HSE leader supported his requests to use ergonomic office equipment; he again asked for help working in the shop; and that he be allowed to bring his own tools to work.  Wildermuth denied plaintiff's requests for the accommodations and did not take any action to provide plaintiff with the said accommodations.

47.     That during the week of January 18, 2021, plaintiff again asked Wildermuth for an accommodation in the form of assistance in the shop to help get the physically demanding work done (in the form of another employee temporarily helping him).  Plaintiff further stated words to the effect that, with his disabilities and physical limitations, he could only do so much; that he was doing the best he could; and that he was not physically capable of getting all the work done in the shop without such an accommodation.  On this occasion plaintiff again requested permission to use a hoist, gantry and lifting table and again brought up the new corporate ergonomic policy (which mandated or encouraged the use of ergonomic equipment and furniture).  In response, Wildermuth stated that he did not understand why it took plaintiff so long (three (3) weeks) to get the work done – ignoring all of the information plaintiff had just provided to him.  The conversation ended with plaintiff volunteering to look into getting a hoist,

and with Wildermuth again refusing to grant the accommodation to plaintiff. Although other employees were present during the above exchange, namely Chad Kievet ("Kievet"), Mike Collazo ("Collazo"), Roel Mariano ("Mariano"), and possibly Austin Smith ("Smith"), none of these employees spoke. The above exchange constituted protected activity under the ADA/ADAAA.

48.    That in or around the week of January 25, 2021, plaintiff made what would be his last request for accommodations to Wildermuth, seeking the accommodations identified in Paragraph 47 above. Again, plaintiff's request for reasonable accommodations was denied. This time, Kievet and Marino were present during the exchange and, again, they did not contribute to the conversation.

49.    That while not feasible to list all examples of the times when Wildermuth rejected plaintiff's requests for reasonable accommodations, Wildermuth's refusal to grant plaintiff reasonable accommodations includes, but is not limited to, the following:

> ❖ In 2020 plaintiff asked Wildermuth if he could use an ergonomic office chair to accommodate his back impairment. Plaintiff's prior managers had all approved his use of such a chair. In fact, plaintiff had used the same black chair for ten (10) years, an accommodation approved by his first manager, Eckert. Yet Wildermuth adamantly rejected plaintiff's request for the accommodation, telling plaintiff that his ergonomic chair did not match the new office furniture and that plaintiff would have to use the chair that was provided to him;

> ❖ In 2020 plaintiff requested a reasonable accommodation from Wildermuth by asking if he could replace an existing love seat/couch for an ergonomic couch so that he could use it on his breaks to put his spine in a neutral position. Again, Wildermuth denied the request for an accommodation, telling plaintiff that there would be no couches in any part of the new area;

> ❖ Plaintiff requested to have and be able to use his own tools to limit repetitive motions, climbing up ladders, and walking around in an effort to find the right tools. Of course, plaintiff's previous supervisors had all granted this accommodation to plaintiff with no issues. At first it appeared Wildermuth would grant plaintiff's

request for the accommodation, telling plaintiff that he could use his own tools. Shortly thereafter, Kievet, one of plaintiff's coworkers, ordered a new toolbox for plaintiff. Surprisingly, Wildermuth then changed his mind about the accommodation, and told plaintiff he was not allowed to have his own tools and toolbox and physically took plaintiff's tools and toolbox away from him;

❖ Typically plaintiff worked without help and had no problems performing most of his tasks. However, throughout the years, occasionally plaintiff would need the help of a coworker whenever a particular task was too physically demanding to perform alone, such as when he had to lift and move heavy objects or when he had to do repetitive heavy shop tasks. As such, during their many one-on-one meetings, and during their weekly meetings, plaintiff would tell Wildermuth he could not physically do some of the work Wildermuth was assigning to him because it exceeded his physical restrictions put in place by his physicians. Plaintiff would then always request an accommodation in the form of temporary, short-term assistance from a coworker to help him complete the task. All three (3) of plaintiff's prior supervisors routinely granted these requests, and the coworkers were always more than happy to help plaintiff. However, Wildermuth would not permit the accommodations, forcing plaintiff to perform the tasks on his own, risking serious injury. Wildermuth even directed at least one of plaintiff's coworkers who had routinely assisted plaintiff in the past, Mike Campanella ("Campanella") to stop assisting plaintiff, even if Campanella had already completed all of his own work. On several occasions when Campanella did try to assist plaintiff, Wildermuth loudly and aggressively admonished or disciplined Campanella for attempting to do so;

❖ Moreover, in denying plaintiff's requests for the accommodations, Wildermuth would angrily respond to plaintiff, telling him, "You will do this work" and "You don't want to see me get mad;"

❖ In 2020 plaintiff made another request for a reasonable accommodation to Wildermuth by asking him if he could use a new, adjustable ergonomic desk for sitting and standing while working on his computer in the new office. At first Wildermuth did not respond to plaintiff's request. A short time later, plaintiff noticed some new furniture in the office which included two (2) new adjustable desks just like plaintiff had requested. When plaintiff asked Wildermuth if one of the new desks was for him, Wildermuth responded in the negative. Despite the denial, plaintiff started to use the desk and apparently no one at defendant stopped him from using it;

15

❖ On numerous occasions in 2019 and 2020, plaintiff requested an accommodation in the form of using a rolling hoist/gantry and a lifting table for lifting heavy objects such as engines and parts and for working on components. Although plaintiff discussed the matter with Wildermuth on numerous occasions, Wildermuth refused to take action on plaintiff's requests. In fact, on or about August 26, 2020, HSE representatives for the defendant came to the plant and performed a walkthrough (or audit) with plaintiff, since he was the Safety Site Leader. During the walkthrough (and as stated on the HSE report), the HSE employee noticed "several awkward heavy parts that require lifting to a working surface. Cummins' lifting guidelines are restricted to 35 pounds." Under the Recommendation part of its report, the HSE team stated in part, "Suggest lifting tables, chain hoists, etc...." Remarkably, this is the same request for an accommodation plaintiff made to Wildermuth both before and after the August 26, 2020 audit, and each time Wildermuth denied the request; and

❖ Many times plaintiff asked Moenssen if he (plaintiff) could meet with him (or any other high-level management employee at defendant) to discuss these accommodation issues. Neither Moenssen nor anyone else replied to plaintiff.

50. That on or about January 27, 2021 Goode messaged plaintiff on his computer, asking plaintiff if he had been released to return to work yet by the doctor for his toe injury. Plaintiff responded in the affirmative, noting his toe was still "not right" or better. That same day, plaintiff messaged Wildermuth advising that he was trying to get a doctor's appointment scheduled for Friday, January 29, 2021 in regard to his toe.

51. That the following day, January 28, 2021, at around 10:00 a.m., Wildermuth walked in the front door and asked plaintiff to accompany him to attend a quick meeting in the training room. Plaintiff did as instructed and followed Wildermuth to the referenced room. Once in the room, plaintiff saw that Wildermuth's supervisor, Moenssen, was also physically present and that the head of Human Resources, Wilson, was present by video. In short order, Moenssen fired plaintiff, without prior warning, notice or cause (and despite the presence of a Corrective Action Policy at defendant), telling plaintiff that he did not "fit in with the team." Shocked and upset, plaintiff asked what he had done wrong and what were the reasons for his

16

termination. Plaintiff further volunteered, while looking directly at Wildermuth, that every time he had a one-on-one meeting with Wildermuth and whenever he asked Wildermuth how he (plaintiff) was doing, Wildermuth always responded that plaintiff was doing a good job and that people were impressed with him. For his part, Wildermuth chose not to respond, instead staying silent with a nervous look on his face. Wilson then stated that plaintiff only lasted two (2) weeks after he completed his PIP – a statement which by all accounts is false. Wilson then stated that what plaintiff thought was good performance and what the company thought was good performance were completely different. When plaintiff asked her again why he was being fired, Wilson stated that it would take too long to explain and that they had to protect their employees – a statement falsely suggesting that plaintiff caused (or was capable of causing) physical harm to his fellow employees (a statement that could not be further from the truth).

      52. That the reasons given by defendant for plaintiff's termination are false, unworthy of credence, and otherwise lack credibility. Plaintiff fit in just fine for over sixteen (16) years at defendant. Plaintiff was really fired in violation of the ADA/ADAAA because: (a) of his disabilities, (b) because of his perceived disabilities, (c) in retaliation for engaging in protected activity under the ADA by asking for accommodations, and (d) because of the leave and accommodations necessitated by plaintiff's disabilities. Moreover, defendant violated the ADA/ADAAA by refusing to accommodate plaintiff and by refusing to enter into dialogue with plaintiff about his disabilities, restrictions, and potential accommodations.

### FOR A FIRST CAUSE OF ACTION: VIOLATION OF THE ADA/ADAAA 42 U.S.C. § 12101, et seq.

      53. That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 52 hereinabove as fully as if set forth verbatim.

54. That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and otherwise subject to it.

55. That as a result of plaintiff's back and foot or toe impairments, and the combined effect of the two conditions, plaintiff was substantially limited in one or more major life activity, namely walking, bending, stooping, standing, sleeping, lifting and pushing.

56. That despite the above, plaintiff could perform the essential duties of his job at defendant with reasonable accommodations in the form of permitting him to use a special or ergonomic couch and chair so that plaintiff could take intermittent breaks at work and sit or lie down for brief periods of time; in the form of assigning another employee to assist plaintiff whenever plaintiff was required to lift heavy objects or perform difficult tasks; in the form of assigning light duty tasks to plaintiff whenever that was available and whenever such work needed to be done; in the form of allowing plaintiff to use his own tools; and in the form of allowing plaintiff to use a hoist or gantry as well as a lifting table to lift heavy objects, among other things.

57. That as such, the plaintiff is disabled as defined by the ADA/ADAAA. Moreover, defendant regarded or perceived plaintiff as being disabled as defined by that Act.

58. That as alleged, plaintiff performed his job duties at defendant in a manner that met defendant's legitimate expectations as, just prior to his termination, plaintiff received a positive performance evaluation, received praise from upper management, and had passed the terms of his PIP.

59. That despite the above, defendant fired plaintiff without warning, notice or cause (even though the defendant utilizes progressive discipline) and for false and vague reasons, or

reasons unworthy of credence.  In all events, defendant fired plaintiff under circumstances which give rise to an inference of discrimination.

60.    That in reality, defendant fired plaintiff because plaintiff is disabled and/or because defendant perceived or regarded plaintiff as disabled and/or because of past and future absences plaintiff took (or would need to take) as a direct result of his disabilities.  In addition, defendant did not want to contend with future absences or the medical insurance expenses related to plaintiff's disabilities.

61.    That as such, defendant violated the ADA/ADAAA in the manners set forth in Paragraph 60 above.

62.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

63.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, knowingly, and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

## FOR A SECOND CAUSE OF ACTION:
## VIOLATION OF THE ADA/ADAAA
## RETALIATION
## 42 U.S.C. § 12203

64.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 63 hereinabove as fully as if set forth verbatim.

65.    That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and is otherwise subject to it.

66.    That on or about January 4, 2021 through January 28, 2021 (and on many prior occasions, all as alleged herein), plaintiff engaged in protected activity under the ADA/ADAAA by requesting  reasonable accommodations in the form of a special or ergonomic couch and chair so that plaintiff could take intermittent breaks at work and sit or lie down for brief periods of time; in the form of assistance from other employees whenever plaintiff needed help lifting heavy objects or performing difficult tasks; in the form of allowing plaintiff to use a hoist or gantry and a lifting table for lifting heavy objects; in the form of assigning lighter job duties for plaintiff to perform (when they were available); and in the form of allowing plaintiff to bring his own tools to work – accommodations plaintiff's prior supervisors at defendant had granted to him.  Defendant (by and through Wildermuth) denied all of plaintiff's requests for reasonable accommodations and they did so in an antagonistic and aggressive manner.

67.    That within three (3) or four (4) days after plaintiff last engaged in said protected activities, defendant fired plaintiff.  That as such, a causal connection existed between plaintiff's protected activities and his termination due to the brief period of time between the two (2) events and due to Wildermuth's tone and demeanor towards plaintiff in denying his said requests.

68.    That as such, defendant fired plaintiff because plaintiff engaged in activity protected by the ADA/ADAAA (in the form of requests for reasonable accommodations) and thereby retaliated against plaintiff, all as prohibited by the Retaliation provision contained in the said Act (42 U.S.C. § 12203).

69.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

70.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A THIRD CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**HARASSMENT/HOSTILE ENVIRONMENT**
**BASED ON DISABILITY**

71.    That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 70 hereinabove as fully as if set forth verbatim.

72.    That at all pertinent times defendant employed fifteen (15) or more employees and, as such is an "employer" as defined by the ADA/ADAAA, and otherwise subject to the said Act.

73.    That as alleged, plaintiff suffers from impairments that render him disabled under the ADA/ADAAA.  Yet, he could still perform the essential duties of his job at defendant. As such, plaintiff was a covered employee under the ADA/ADAAA.

74.    That defendant's conduct (by and through Wildermuth and others) against plaintiff was motivated by plaintiff's disabilities and/or perceived disabilities.  Moreover, the conduct, which spanned over two (2) years, was repeated, continuous, and severe enough to affect the terms and conditions of plaintiff's employment at defendant.

75.    That defendant's harassment (by and through Wildermuth and others) against plaintiff entailed, but was not limited to, repeated denials of plaintiff's requests for accommodations in an unnecessarily rude, angry and antagonistic manner, excluding plaintiff from meetings he should have attended, attempting to solicit negative input from plaintiff's coworkers, and assigning plaintiff work that exceeded his medical restrictions – the kind of harassment that placed plaintiff at risk to sustain serious physical injury.

76.    That defendant's behavior humiliated plaintiff, unreasonably interfered with his work performance, affected the terms, conditions and privileges of his employment at defendant and otherwise caused plaintiff severe psychological and physical harm.  Moreover, the harassment was pervasive and severe and happened on repeated occasions.

77.    That plaintiff objected to the harassing conduct and was offended by it.

78.    That defendant's actions as alleged above, created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

79.    That defendant was aware of the harassment as plaintiff complained about the above-described harassment directly to defendant on numerous occasions and defendant was otherwise on notice that the harassment was occurring as it occurred openly and on a widespread basis at the defendant and supervisors at defendant participated in the harassment.

80.    That despite the above, defendant wholly failed to take prompt and effective remedial action to end the harassment, and defendant continued to harass and discriminate against the plaintiff due to his disabilities, even after plaintiff complained about the harassment and/or after defendant became aware of the harassment or should have been aware of it.

81.    That the actions of defendant in subjecting plaintiff to unwanted harassment, all as described above, constitutes discrimination against plaintiff based on his disabilities and/or perceived disabilities in violation of the ADA/ADAAA.

82.    That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

83.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**42 U.S.C. § 12110, et seq.**
**FAILURE TO ENGAGE IN DIALOGUE**
**REFUSAL TO ACCOMMODATE**

84.    That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 83 hereinabove as fully as if set forth verbatim.

85.    That as alleged above in a more specific manner, plaintiff repeatedly sought and requested that defendant provide him with reasonable accommodations.

86.   That while plaintiff's previous supervisors all granted the accommodations requested by plaintiff, plaintiff's final supervisor, Wildermuth, refused to grant plaintiff those very same accommodations.

87.   That moreover, once Wildermuth became plaintiff's supervisor, neither Wildermuth nor anyone else at defendant engaged in dialogue with plaintiff or any other type of interactive process with plaintiff, whereby plaintiff's disabilities and potential accommodations for those disabilities were discussed.

88.   That the defendant's refusal to engage plaintiff in the said dialogue or interactive process and its refusal to grant plaintiff's accommodations violate the ADA/ADAAA. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

89.   That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, as to all of plaintiff claims under the ADA/ADAAA, plaintiff prays for judgment against the defendant for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life,

embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the cost and disbursements of this action, including plaintiff's reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: _s/A. Christopher Potts_
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
**Attorneys for the Plaintiff**

Charleston, South Carolina
July 10, 2023